IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CYNTHIA POTTER, | ) | Civil No. 3:10-cv-06316-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kathryn Tassinari
Brent Wells
Harder, Wells, Baron & Manning, P.C.
474 Willamette Street
Suite 200
Eugene, OR 97401

Attorneys for Plaintiff

Dwight C. Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Willy M. Le
Special Asst. U.S. Attorney
Office of General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Cynthia Potter brings this action pursuant to 42 U.S.C. § 423, seeking judicial review of a decision of the Commissioner of Social Security (the Commissioner) denying her application for Disability Insurance Benefits. Plaintiff seeks an Order reversing the decision of the Commissioner and remanding the action to the Social Security Administration (the Agency) for an award of benefits.

The Commissioner concedes that the ALJ made substantial errors, and asks that the action be remanded to the Agency for further proceedings. Therefore, the only question presented here is whether the remand of the action should be for an award of benefits, or for further proceedings.

For the reasons set out below, the Commissioner's request for remand for further proceedings should be denied, and the action instead should be remanded for an award of benefits.

## **Procedural Background**

Plaintiff filed an application for Disability Insurance Benefits on December 17, 2007, alleging that she had been disabled since September 3, 2005, because of back problems and

FINDINGS AND RECOMMENDATION - 2

partial paralysis of her left leg.  After her application had been denied initially and upon

reconsideration, she timely requested a hearing before an Administrative Law Judge (ALJ).

A hearing was held before ALJ Gerardo Mariani on November 3, 2009, in Eugene,

Oregon.  Plaintiff; Gary Fisher, Plaintiff's husband; and Lloyd Fassinger, a Vocational Expert;

testified at the hearing.

The ALJ issued a decision on November 24, 2009, finding that Plaintiff was not disabled.

That decision became the final decision of the Commissioner on July 28, 2010, when the

Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff seeks

judicial review of that decision.

## Factual Background

Plaintiff was born on March 22, 1971, and was 38 years old at the time of the hearing

before the ALJ.  She completed the 9th grade, and has past relevant work experience as a

manicurist.  She contends that she has been disabled since she was involved in an automobile

accident in September, 2005.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary

of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir.

1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial

gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is

FINDINGS AND RECOMMENDATION - 3

not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520©.

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that

FINDINGS AND RECOMMENDATION - 4

the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden,

the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy.  Id.

## Medical Record

Plaintiff was sitting in a parked car that was rear ended by another vehicle on September

3, 2005.  She was taken to an emergency room, where she was diagnosed with a thoracolumbar

strain and a left ankle sprain.  Notes of that visit indicate that Plaintiff complained of pain "all

over" and the treating doctor noted that her "degree of complaints" made examination difficult.

Thoracolumbar x-rays appeared to be normal.

Plaintiff sought treatment for neck pain at an emergency room on October 8, 2005.  The

examining doctor observed that there was "certainly a significant emotional overlay" to

Plaintiff's complaints.  A cervical CT scan showed an abnormal soft tissue mass, which was

considered possibly secondary to an inflammatory or post-traumatic process.

Plaintiff improved slowly following the accident, but was concerned about rheumatoid

arthritis because she had experienced pain in the MCP joints of both hands, with intermittent

swelling, for several months.  She also reported occasional pain in her knees.  Testing showed no

evidence of rheumatoid arthritis.

Plaintiff underwent physical therapy for her lumbar strain and left ankle sprain from late

September, 2005 until November, 2005.  Beginning in October, 2005, she also began

chiropractic treatment which continued through 2007.

FINDINGS AND RECOMMENDATION - 5

In January, 2006, Plaintiff told Dr. John Sharrer that she had been taking Zoloft, which had been prescribed by a psychiatrist, for about a year.  She reported that she had been taking this medication for depression related to family issues, but that it had undesirable side effects.  Dr. Sharrer discontinued the Zoloft and started Plaintiff on Cymbalta.

On February 13, 2006, Dr. Thomas Wuest, an orthopedic surgeon, performed left ankle peroneus brevis repair and tenosynovectomy.  Dr. Wuest noted that Plaintiff reported continued knee and ankle pain following her accident.  On April 14, 2006, Dr. Sharrer noted that Plaintiff was still wearing a walking boot that had been prescribed following her ankle surgery.

On June 13, 2006, Plaintiff was seen "urgently" by Dr. Jane Neary for complaints of headache and nausea.  Dr. Neary noted that Plaintiff had recently undergone laser surgery to repair retinal holes in both eyes.  Plaintiff's ophthalmologist thought Plaintiff's headache was not related to her eye surgery.  Plaintiff reported that she had been crying for two days because of family stress, and Dr. Neary suspected that this was the cause of her headache.

In notes of a visit on September 6, 2006, Dr. Sharrer indicated that Plaintiff presented in tears and reported markedly increased anxiety over the preceding two to three weeks.  Dr. Sharrer prescribed Effexor.  That  medication was discontinued after Plaintiff reported headaches, and Zoloft was prescribed.  Notes of a visit on September 20, 2006 indicate that Plaintiff had much better control of her emotions and smiled.  Dr. Sharrer noted that Plaintiff was scheduled for low back surgery with Dr. Scott Kitchel, an orthopedic surgeon.

Plaintiff was hospitalized for lumbar internal disc disruption syndrome surgery on September 29, 2006.  Dr. Kitchel did not perform the surgery, however, and terminated Plaintiff as a patient.  In his chart notes, Dr. Kitchel stated that the anesthesiologist had refused to sedate Plaintiff after learning that Plaintiff had consumed coffee with creamer in it before the operation.

FINDINGS AND RECOMMENDATION - 6

Plaintiff was transferred to Dr. Christopher Miller, another neurosurgeon.  Dr. Miller thought that disc replacement was a good option for Plaintiff, and he and Dr. Charles Stanton performed a left anterior L5-S1 total disc replacement on October 19, 2006.

Plaintiff was hospitalized for pain control for nearly a week after her surgery.  She initially did well following surgery, but her progress then stalled.  On January 2, 2007, Plaintiff reported that she continued to experience significant pain, which went down her left leg when she was standing.  Plaintiff reported that she did not feel much different than she had felt before the surgery.  Dr. Miller noted that she was quite obese and had been minimally active.  He found that the replacement disc was "perfectly positioned" and in good alignment, and opined that Plaintiff would have to work on her rehabilitation "a little bit" if she were to improve.  Dr. Miller noted that Plaintiff asked him "about disability" and expected him to write a letter.  He indicated that he was not "sure exactly" what Plaintiff meant, but opined that Plaintiff was "certainly disabled for the next 6 to 12 months" while recovering from surgery.  Dr. Miller added that he hoped that her disability would not be long-term or permanent.

Plaintiff was seen by Dr. Nosce on May 16, 2007.  Plaintiff reported that she had significant pain in her low back, which radiated into her right buttock.  Dr. Nosce diagnosed lumbar degenerative disc disease after L5-S1 disc replacement, and prescribed Percocet.

On June 6, 2007, Dr. Neema Reddy saw Plaintiff for a "follow up on back pain."  Dr. Reddy stated that Plaintiff had been struggling with back pain, and had been taking narcotic medications since surgery was performed in October, 2006.   She denied Plaintiff's request for Soma and advised her to try Flexeril instead.  Dr. Reddy prescribed Percocet, and told Plaintiff that she would need to sign a pain contract in order to obtain refills.

FINDINGS AND RECOMMENDATION - 7

In notes of a visit on June 12, 2007, Dr. Reddy indicated that Plaintiff had been "using excessive amounts of narcotics." She noted that Plaintiff had agreed to a pain contract.

On August 1, 2007, Plaintiff was examined by Dr. James Morris, a pain specialist, and Carolyn Buel, a nurse practitioner. Plaintiff reported that her pain had improved when she took Methadone, and that she was sleeping better with Ambien/Zolpidem. Plaintiff was described as "a complex patient" with chronic intractable pain related to degenerative disc disease and low back pain with radicular symptoms complicated by probable fibromyalgia and anxiety. Plaintiff was characterized as "doing well with her intractable pain management" at that time, and her use of long-acting opiate therapy was described as successful. Her functioning was described as "improved."

On August 29, 2007, Plaintiff reported that her pain had worsened after she slipped and fell. Dr. Morris prescribed Soma for one month for severe muscle spasms.

On September 30, 2007, Plaintiff told Dr. Stewart Mones that she had nausea at times after taking her medications. Dr. Mones noted that Plaintiff was taking Percocet, Methadone, Soma, and Zoloft. He prescribed Phenergan.

On October 3, 2007, Dr. Morris and Buel noted that 12 out of 18 tender points were positive, and control points were not detected. They diagnosed diffuse allodynia and rule-out fibromyalgia, and noted that Plaintiff was "doing well with her intractable pain management" at that time. Plaintiff's pain symptoms were stable, and the treatment she was receiving appeared to be appropriate. Plaintiff reported that she had used marijuana daily since her accident to control muscle spasms and help with sleep, but that she had not used it since July, 2007.

In notes of a visit on June 10, 2008, Dr. Reddy indicated that Plaintiff had lost her medical insurance because her husband had lost his job. Dr. Reddy opined that, other than being

FINDINGS AND RECOMMENDATION - 8

saddened by the death of a family member, Plaintiff appeared to be doing well.  She diagnosed fibromyalgia syndrome with chronic pain, anxiety, and depression, and prescribed Percocet and Methadone for pain, Prozac for depression, and Ambien for insomnia.

On November 5, 2008, Plaintiff told Dr. Nosce that she had "hurt all over" during the previous four days.  Plaintiff was described as experiencing "breakthrough" pain and depression symptoms.  Dr. Nosce noted that Plaintiff was uncomfortable and "depressed-appearing," and was "tender to soft touch along her entire trunk, hips, shoulders."  She was diagnosed with "fibromyalgia flare with seasonal & stress triggers" and oxycodone was added to Plaintiff's other pain medications.

On May 12, 2009, Dr. Reddy noted that Plaintiff had been "asked to come in to discuss her narcotic use," and that a urine drug screen had tested positive for benzodiazepine and Hydrocodone that had not been prescribed through her office.   Plaintiff reported that, after her son was involved in an automobile accident she had taken some Valium which was left over from an old prescription from Dr. Morris, whom she could not see because of a loss of insurance coverage.  She added that she had taken Lortab prescribed for her husband, which explained the positive Hydrocodone results.  Dr. Reddy warned Plaintiff about the use of medications that had not been prescribed through her office, and Plaintiff said she was willing to submit to future drug tests if needed.  Dr. Reddy diagnosed chronic pain syndrome with fibromyalgia and a history of degenerative disc disease.

In a visit on September 3, 2009, Plaintiff reported worsening anxiety related to problems with her children.  Dr. House diagnosed anxiety with acute exacerbation secondary social stressors, insomnia secondary to situational stress, and chronic pain secondary to injuries suffered in a motor vehicle accident.  She prescribed Valium and Ambien.

FINDINGS AND RECOMMENDATION - 9

On November 2, 2009, Dr. Morris indicated that he agreed that a letter written by Plaintiff's counsel accurately summarized a conversation between counsel and himself concerning Plaintiff's medical condition.  The letter stated that, beginning in July, 2007, Dr. Morris had treated Plaintiff for chronic body pain, and that his diagnosis of the underlying cause had "morphed" from diffuse allodynia into fibromyalgia.  The letter described fibromyalgia as a disorder of the nervous system which caused individuals with the disease to process pain differently from others.  Dr. Morris indicated that back injuries such as Plaintiff had suffered in 2005 often triggered fibromyalgia, and opined that Plaintiff's active fibromyalgia was triggered by that accident, which had required L5-S1 disc replacement.  His fibromyalgia diagnosis was based upon "the realm of her pain complaints and her painful reaction to non-painful stimuli." The letter stated that pain, fatigue, and poor stress tolerance associated with fibromyalgia can limit daily activities, and that individuals with fibromyalgia cannot stay in the same position for long, and must lie down frequently.  Secondary complaints such as migraines, irritable bowel syndrome, or other nervous system disorders are often associated with the disease, and individuals with fibromyalgia may be "functional" for a few days, and then need to be totally inactive.  Dr. Morris opined that fibromyalgia had rendered Plaintiff disabled since September, 2005.

**<u>Hearing Testimony</u>**

1. **<u>Plaintiff's Testimony</u>**

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff has been unable to work since she was involved in an automobile accident in 2005.  After the accident, she was in a wheel chair, wore a neck collar for three months, and experienced significant back pain.  Following retinal surgery on both her eyes, Plaintiff continued

FINDINGS AND RECOMMENDATION - 10

to be extremely sensitive to light, have trouble focusing, and have frequent migraine headaches. Her vision problems would prevent her from returning to her past work as a manicurist. At the time of the hearing, Plaintiff continued to experience "extreme back pain" because of fibromyalgia.

Plaintiff has her ups and downs: On good days she could do things with her children, go shopping, and go to the movies. However, if she did these things one day, she could not do them the next day. On the especially bad days that she had once or twice per month, simply breathing made her feel as if her ribs would break.

Plaintiff sometimes tried to do a little laundry, and sometimes could do the dishes. If she did those activities, she then needed to lie down for a few hours. Socializing or going places caused Plaintiff significant anxiety since her accident, and she no longer saw people socially. Plaintiff missed working as a manicurist, and would have returned to that work if she could.

## 2. **Testimony of Plaintiff's Husband**

Plaintiff's husband, Gary Fisher, testified as follows at the hearing.

Fisher married Plaintiff in April, 2007, and had spent a lot of time with her before that date. Before her accident, Plaintiff had lived an active life style that included motorcycle riding. After the accident, Plaintiff was "trapped" in the house, and could not do anything or go anywhere. Her pain had been "off the charts" on most days since the accident. After the accident, Fisher had to feed Plaintiff, help her go to the bathroom, cook, and clean. On bad days, he still fed her and helped her bathe.

## 3. **Testimony of Vocational Expert**

The ALJ posed a vocational hypothetical describing an individual who could occasionally lift and carry 20 pounds and could frequently lift and carry 10 pounds, could only climb and

FINDINGS AND RECOMMENDATION - 11

stoop occasionally, and who needed to avoid exposure to vibrations and dust.  The VE testified that such an individual could perform Plaintiff's past relevant work as a manicurist.

When the ALJ added to these limitations the inability to perform sustained employment eight hours a day, five days a week, the VE testified that the individual could not work.

In response to further questioning by the ALJ, the VE testified that an individual who could not sit beneath or in front of "any sort of bright lights" could not perform Plaintiff's past relevant work as a manicurist.

### ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement for disability insurance benefits on June 30, 2007.

At the first step of his disability determination, the ALJ found that Plaintiff had not engaged in substantial gainful activity between the date of her alleged onset of disability on September 3, 2005, and her date last insured.

At the second step, the ALJ found that Plaintiff's low back pain disorder and status post retinal detachment repair were severe impairments, and that Plaintiff's depression was not a severe mental impairment.  In assessing Plaintiff's depression, the ALJ found that Plaintiff had only mild limitations in social functioning or in concentration, persistence, or pace.

At the third step of his analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the presumptively disabling impairments set out in the "listings," 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.2520(d), 404.1525, and 404.1526).

FINDINGS AND RECOMMENDATION - 12

The ALJ next assessed Plaintiff's residual functional capacity (RFC). He found that Plaintiff retained the capacity to perform light work, except that she was limited to occasional climbing of ramps, ladders, stairs, ropes, or scaffolds; occasional stooping; and frequent balancing, kneeling, crouching and crawling; and could not be exposed to vibration or hazards such as dangerous moving machinery and unprotected heights. In determining Plaintiff's RFC, the ALJ found that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with his RFC assessment. The ALJ found that, because Plaintiff married in 2007, the "vast majority" of the testimony of her husband "touched upon matters outside the relevant disability period before the date last insured expired."

Based upon the VE's testimony concerning the functional capacity needed to work as a manicurist, the ALJ concluded that Plaintiff could perform that past relevant work. Accordingly, he found that she was not disabled within the meaning of the Act.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ failed to provide the required support for his conclusion that she was not wholly credible, failed to properly consider lay witness testimony provided by her husband, erred in failing to address the opinion of Dr. Morris, her treating pain specialist, and erred in failing to characterize fibromyalgia, ankle pain, and depression as "severe" impairments at step two of his disability analysis.

As noted above, the Commissioner agrees that the ALJ made "several errors weighing the evidence" which require that the action be remanded. The Commissioner acknowledges that the ALJ failed to address Dr. Morris's opinion and misinterpreted the testimony of Gary Fisher, Plaintiff's husband. The Commissioner contends that these errors require remand for further proceedings, and make it unnecessary to address the remaining questions of the evaluation of Plaintiff's credibility and the adequacy of the ALJ's "severe impairment" assessment. He asserts

that, because the ALJ erred in weighing other evidence, "his credibility finding, and his residual functional capacity assessment, constitute outstanding issues that require further analysis." The Commissioner argues that these issues must be re-evaluated on remand because the question whether they were properly decided before is moot.

1. **Failure to Address Opinion of Treating Pain Specialist**

The ALJ asserted that "there is no medical source opinion stating that the claimant is permanently disabled or unable to perform work-related activities."  In light of Dr. Morris's opinion that Plaintiff had been disabled since September, 2005, that assertion was clearly incorrect.

The ALJ here did not address Dr. Morris's fibromyalgia diagnosis or opinion that Plaintiff's fibromyalgia was disabling.  There is no question that this was an error: An ALJ is required to consider and address medical source opinions, and is required to explain the rejection of the opinion of a medical source.  SSR 96-8p at *6.

The ALJ's failure to address Dr. Morris's opinions is especially significant because Dr. Morris was a treating physician.  Because treating physicians have a greater opportunity to know and observe their patients, their opinions are entitled to greater weight than the opinions of other physicians.  Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  If a treating physician's opinion is contradicted by the opinion of another doctor, an ALJ must support its rejection with "findings setting forth specific and legitimate reasons for doing so that are based upon substantial evidence in the record."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting the opinion of a treating physician that is not contradicted by another doctor.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).

The medical record here includes no opinions of treating or examining physicians contradicting Dr. Morris's opinions as to either Plaintiff's fibromyalgia diagnosis or the severity of the limitations that Plaintiff experienced as a result of the disease.[1]  Therefore, in addition to specifically addressing Dr. Morris's opinions, the ALJ was required to provide clear and convincing reasons for their rejection.

Where, as here, an ALJ provides inadequate reasons for rejecting the opinion of a treating physician, that opinion is credited as a matter of law.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985).  Whether an action is remanded for further proceedings depends on the likely utility of additional Agency consideration.  Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited.  Smolen, 80 F.3d at 1292.

Here, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Plaintiff's treating physician.  Though the Commissioner argues otherwise, there are no

---

[1] The medical record includes, and the ALJ cited for other purposes, opinions of non-treating, non-examining State Agency doctors that differed with Dr. Morris's opinion as to Plaintiff's functional capacity.  Even if the ALJ had addressed Dr. Morris's opinion, the opinions of the State Agency doctors would not have supported his rejection of Dr. Morris's opinions, because "the opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995) (citations omitted).

outstanding issues that need to be resolved before a determination of disability can be made.  The record is complete, and it is clear from that record that a finding of disability would be required if Dr. Morris's opinions as to the severity of limitations Plaintiff had experienced since September, 2005 were credited.

Under these circumstances, I would recommend that the action be reversed and remanded for an award of benefits regardless of my analysis of the balance of Plaintiff's arguments. However, in order to create a full record for any potential review, I will briefly address the other issues Plaintiff has raised.

## 2. **Evaluation of Lay Witness Testimony**

As noted above, Plaintiff's husband testified that, after she was involved in an automobile accident in September, 2005, Plaintiff had been "trapped" in her house, unable to independently care for herself, to  "do anything," or to "go anywhere."

The ALJ concluded that the "vast majority" of Gary Fisher's testimony addressed matters outside the relevant period.  A review of the transcript does not support this conclusion. Plaintiff's husband addressed most of his testimony to the period before Plaintiff's date last insured, and there is no basis for concluding that any of his testimony that was not confined to the relevant period did not also describe Plaintiff's condition before her date last insured.

An ALJ must provide reasons that are germane for discounting lay witness testimony. E.g., Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).  The ALJ did not provide a germane reason for discounting the testimony of Plaintiff's husband, and that testimony should be credited here.  See Schneider v. Commissioner, 223 F.3d 968, 976 (9th Cir. 2000).  Though I would recommend remanding this action for an award of benefits for other reasons regardless of the

ALJ's assessment of Gary Fisher's testimony, crediting that testimony further supports remand for an award of benefits.

3. **ALJ's Evaluation of Plaintiff's Credibility**

As noted above, the Commissioner contends that, because the ALJ erred in other respects, his credibility determination is now moot, and credibility should be addressed again on remand. I agree that it is technically unnecessary to reach this issue, but only because remand for an award of benefits would be appropriate whether the ALJ supported his credibility determination or not. Nevertheless, I will briefly address the issue.

a. **Applicable Standards**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's statements concerning the severity of his symptoms merely because they are unsupported by objective medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(en banc)). If a claimant produces medical evidence of an underlying impairment and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons, supported by substantial evidence, to support a determination that the claimant was not wholly credible. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); SSR 96-7p. If an ALJ's credibility determination is supported by substantial evidence, it must be upheld even if some of the reasons cited by the ALJ are not correct. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

b. **Analysis**

Because Plaintiff produced evidence of underlying medical conditions that would be expected to produce some symptoms and there was no evidence of malingering, the ALJ was required to support his determination that Plaintiff was not wholly credible with specific, clear and convincing reasons that were supported by substantial evidence.  Plaintiff contends that the ALJ failed to provide such support for his credibility determination.  I agree.

The ALJ cited Dr. Miller's treatment notes in support of his assertion that the medical record was inconsistent with Plaintiff's allegations of impairment.  Dr. Miller's records do not support this assertion.  Dr. Miller stated that Plaintiff was "certainly" disabled for at least 6 to 12 months while she recovered from surgery, and that he hoped her disability would not be long-term or permanent.  While Dr. Miller did not address other limitations that Plaintiff experienced from fibromyalgia, his opinion at the very least supported a claim for a 12 month closed period of disability.

The ALJ next noted that, shortly before the end of her insured status, Plaintiff told her doctor that she wanted to "wean" herself from narcotic pain medication.  The ALJ appears to imply that this showed that Plaintiff was no longer experiencing severe pain at that time.  This implication is not supported by the medical record which shows that Plaintiff was not able to discontinue the use of narcotic medication, but instead was taking more of these medications a short time after expressing her desire to discontinue their use.

The ALJ asserted that there was insufficient objective medical evidence to support Plaintiff's allegations that her condition worsened following her back operation in 2006.  He asserted that, by October, 2007, chart notes showed that Plaintiff was doing well with pain management and had improved levels of function and activity.  These arguments are not

FINDINGS AND RECOMMENDATION - 19

supported by the record. Though Plaintiff reported that her pain was less intense when she took Methadone, she also reported that it caused significant sleepiness and fatigue. As noted above, the ALJ did not address Dr. Morris's fibromyalgia diagnosis, or Dr. Morris's opinion that this disease had been triggered by Plaintiff's accident and subsequent surgery, and was disabling. Those opinions were inconsistent with the ALJ's assertion that the medial record showed that Plaintiff improved following her surgery, and was not severely impaired by October, 2007.

The ALJ next asserted that Plaintiff's complaints were not supported by objective medical evidence of Plaintiff's condition before June 30, 2007, her date last insured, and that most of the evidence introduced at the hearing related to events that occurred after that date. These contentions are not supported by the medical record or a careful review of the hearing transcript. During the hearing, Plaintiff's counsel elicited testimony that related to Plaintiff's condition before her date last insured. Moreover, the medical record included ample evidence supporting the conclusion that Plaintiff was severely impaired before her date last insured. The record shows that between February and October, 2006, Plaintiff had ankle surgery, a lumbar discectomy, and two retinal surgeries, and that in January, 2007, her treating surgeon opined that she would be unable to work for at least 6 to 12 months. The record includes the uncontradicted opinion of Plaintiff's treating doctor that Plaintiff had been disabled by the effects of fibromyalgia since September, 2005, and showed that Plaintiff consistently sought medical treatment for pain following her back surgery in October 2006.

Finally, the ALJ stated that, in the pre-hearing record, Plaintiff had indicated that she quit her work for reasons unrelated to her medical condition. He cited Plaintiff's statement that she had stopped working in January, 2005 because of "lack of work," and that she had only worked for the holidays. In addition, Plaintiff stated:

FINDINGS AND RECOMMENDATION - 20

> I would go to work full time but sometimes I would not have clients so I could not make enough money to file for taxes. Other years were better than some. My income varied but I did show up to offer my services. I was paid mainly based on commission or the number of jobs I got from the number of clients per day.

Read together, these statements appear to indicate that Plaintiff continued to offer her services until her accident in September, 2005. In any event, the ambiguous reference in question is not a clear and convincing basis for discrediting Plaintiff.

When an ALJ provides insufficient reasons for concluding that a claimant was not credible, there are no outstanding issues to be resolved, and the ALJ would be required to find the claimant disabled if the claimant's testimony were accepted, the claimant's testimony is accepted, and remand for an award of benefits is appropriate. E.g., Harman, 211 F.3d at 1178. Here, the ALJ did not provide adequate reasons for discounting Plaintiff's testimony, and that testimony, if accepted, would require a finding of disability. Though the Commissioner contends otherwise, there are no outstanding issues to be resolved before a determination of disability can be made. Accordingly, this action should be remanded for an award of benefits.

4. **ALJ's Severe Impairment Analysis**

Plaintiff contends that the ALJ erred in failing to include fibromyalgia and depression/anxiety as "severe" impairments at the second step of his analysis, and in failing to consider limitations resulting from those impairments in assessing her RFC.

I agree. The "severity" analysis at step two of the disability determination process "is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987); SSR 85-28; Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988)). An ALJ can find that an impairment is 'not severe' only if the evidence establishes that it has "no more than a minimal effect on an individual's

ability to work." Id.  Here, the medical record established that fibromyalgia and Plaintiff's mental problems were impairments that had more than a minimal effect on Plaintiff's ability to work.  That record includes the uncontroverted opinion of a treating physician that Plaintiff had been disabled by fibromyalgia.  Those impairments should have been characterized as "severe" at step two, and considered in evaluating Plaintiff's RFC.

## Conclusion

For the reasons set out above, the Commissioner's motion to remand for further proceedings, set out in the Commissioner's responding memorandum (# 20), should be DENIED, and a judgment should be entered REVERSING the decision of the Commissioner and REMANDING this action to the Agency for an award of benefits.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due April 5, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 19th day March, 2012.


 /s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge